57   221
135   506

# Beans *versus* Bullitt & Fairthorne.

1. To constitute an assignment for the benefit of creditors within the Act of March 24th 1818, there must be a transfer of the property to another; more than a transmission of its custody and management. The form is not material. There must be a trust created for the creditors which is enforceable in equity.

2. An avowed purpose of a borrower of money to apply it in a certain way is not an application of it.

3. An agent directed to pay money generally, without specification of amount or of the person of the payee as distinguished from others, has never been held to be a trustee for any other than the principal.

4. An assignment construed and held to be a pledge.

February 11th 1868. Before THOMPSON, C. J., STRONG, AGNEW and SHARSWOOD, JJ. READ, J., at Nisi Prius.

[Beans *v.* Bullitt.]

Error to the District Court of *Philadelphia :* No. 142, to January Term 1868.

On the 2d of November 1864 Thomas J. Beans recovered judgment for $9108.50 against William H. Lawson, surviving partner of Lawson & Yerkes.

On the same day an attachment execution was issued on this judgment, in which, amongst others, John C. Bullitt and Frederick Fairthorne, partners, under the firm of Bullitt & Fairthorne, were garnishees.

Interrogatories to the garnishees were filed.

The 5th, 7th and 9th with their answers were, in substance, as follows :—

5. Whether the garnishees had in their possession or control any property of any kind belonging to the defendant or in which he was interested.

The answer was, that Fairthorne, by virtue of an agreement set forth in the answer to the 7th interrogatory (to which they refer for a more full answer to this interrogatory), had under his control effects of defendant valued at $6000, but is bound to account for them not to the defendant, but according to that agreement.

7. " Did Lawson & Yerkes assign to you for the benefit of the creditors, or for some other purpose, and what, certain property, &c.? set forth when the said assignment was made, whether the same was in writing or otherwise, and if in writing, annex a copy, &c.; state whether said writing has been recorded, and when, and where. Annex a schedule of the property so transferred and an account of your dealings and transactions in respect of said property, and what money or proceeds you have received or collected from the sale of said property, or collections of said claims, and what of the said property or claims now are and were in your hands at the time of the service of the writ of attachment on you."

The answer was, " the defendants did assign to Frederick Fairthorne certain effects and property; said assignment was made by an agreement dated July 10th 1860, a copy of which is hereto annexed, marked A. Its object was to secure certain advances of money which he agreed to make to said Lawson & Yerkes, as is shown by said agreement."

On the 25th day of July 1860, the firm of Lawson & Yerkes was dissolved by mutual consent, to take effect on the 31st day of July, 1860, and in order to wind up the business of the firm, a further agreement was entered into between them and Fairthorne, whereby he was constituted the attorney in fact of the firm, and authorized to wind up the business. A copy of said agreement is also annexed, marked B. Neither of said instruments was ever recorded. At that time, and for many months afterwards, Lawson & Yerkes were believed to be entirely solvent. The

[Beans *v.* Bullitt.]

agreement of July 25th 1860, was made only because they desired to procure the services of Fairthorne to wind up the business, as they disagreed between themselves.

In September 1861, but before enough had been collected by Fairthorne to repay the advances made by him, Lawson & Yerkes executed the transfer, a copy of which is hereto annexed, marked C. Subsequently Fairthorne received a notice from the persons to whom the transfer had been made, of which a copy is hereto annexed, marked D. Fairthorne avers that since the repayment of his advances out of the collections of said estate, he has held the said effects as the attorney and representative of the persons named in the said transfer.

Before the attachment was issued Edward Yerkes, one of the defendants, died. Bullitt has no funds in his hands received from said defendants, except as Fairthorne has kept the funds collected by him in the accounts of Bullitt & Fairthorne.

Garnishees aver that they are not bound to make any further answers in reference to these transactions.

By the agreement (Exhibit A.) Lawson & Yerkes assigned to Fairthorne all their claims, assets, &c., except stock of liquors on hand and real estate, to be " held, sold, collected and assigned by him in such manner as may seem best:" they bound themselves to execute to him bonds and mortgages to the value of their firm real estate and to give him security for the value of the stock, all payable at such dates as he should require. Fairthorne to hold the property and securities for such advances as he should make to pay their debts, the amount he was to advance to be sufficient to pay $18,962.37 borrowed money, and not to exceed $4000 bills payable in July 1860: this was to be the full amount of his advances. He to have the right to use the assigned property and securities to pledge for the purpose of raising money to make advances, &c. There were further provisions for his compensation and expenses.

By the agreement (Exhibit B.) the partnership was dissolved, the stock of goods was to be appraised and divided equally between Lawson and Yerkes, each to give his notes to Fairthorne with security, the notes payable as specified. All the notes, bills, book accounts, claims and effects of the firm, and also their real and personal estate (except the stock of goods which had been disposed of as above stated), were thereby placed in the hands of Fairthorne as the attorney in fact of Lawson & Yerkes, upon the terms and for the uses and purposes thereinafter mentioned. Lawson & Yerkes to execute the necessary instruments to pass the title of the assigned estate and effects to Fairthorne, he to hold all the estate, &c., for the purpose of converting them into money, with as full power, as their attorney in fact, as they personally could have, except that if he should have an offer for any

of the property less than it was appraised at, he was to consult them; if they should differ in opinion, he to decide, and if he should determine to accept the offer, the one who objected to have an opportunity for forty-eight hours of taking the property at the offer. The proceeds were to be applied to pay the debts of the firm as they should become due, first paying Fairthorne's advances and all expenses. A list of debts was annexed to this agreement, and it was provided that if the assets should not realize sufficient to pay those debts, Fairthorne might call on Lawson & Yerkes to pay their notes given for the stock, &c. After payment of all the firm debts, the balance to be divided equally between Lawson and Yerkes; the name of the firm to be used when necessary, and each partner to sign the firm name when requested by Fairthorne.

"This power of attorney is given to Fairthorne to enable him to wind up the business of the firm of Lawson & Yerkes, and is only intended to constitute him the attorney in fact of the firm. This power of attorney is also subject to the terms of an agreement heretofore made between the parties hereto, dated July 10th 1860."

The transfer (Exhibit C., dated September 25th 1861), assigned to Thomas Beans and fifteen other creditors, naming them, all the property of every kind of Lawson & Yerkes in the hands of Fairthorne, subject to the lien for money due him, then amounting to $12,846.78, and to so much as he might thereafter advance, to secure to the named creditors certain specified amounts stated in the transfer to be due to them respectively, and when collected to pay their debts *pro ratâ*.

The notice (Exhibit D), signed by fourteen creditors, not including Thomas Beans, was:—

"F. Fairthorne, Esq.

Dear Sir:—We have received from Messrs. Lawson & Yerkes the transfer of which the enclosed is a copy. You will please take notice of the same, and account to us for the property and assets referred to therein, when you have been paid the amount due to you."

9. "What sums had been collected by the garnishees since filing answers to the previous interrogatories?"

The answer was, that by an account theretofore filed coming down to January 25th 1865, Fairthorne had in his hands $4081.42, and had since made disbursements, acting as agent and attorney in fact for the creditors under the transfer of September 25th 1861, and that it will probably be necessary to make further outlays, &c.

The garnishees also pleaded *nulla bona*.

On the trial the above answers and exhibits were given in evidence by the plaintiffs; they offered no other evidence:—the garnishees submitted no evidence.

[Beans v. Bullitt.]

The court charged:—"That the exhibits referred to in the answers of the garnishees, and thereto attached, did not constitute an assignment for the benefit of the creditors of the defendant in the attachment, that the amount in the hands of the garnishees was not subject to said attachment, and the jury should find for the garnishees."

The verdict was for the garnishees.

On a motion for a new trial, the court below (Sharswood, P. J.) delivered the following opinion:—

"This is an attachment execution. All the evidence in the case consists of the answers of the garnishee. The possession of a sufficient fund to meet the claim of the plaintiff is admitted; but the answers show that this fund is held under three different instruments, all of which, taken together, the plaintiff contends amount to an assignment for the benefit of creditors, and are void—not having been recorded in pursuance of the Act of Assembly. The jury were directed to find a verdict for the garnishees, and this direction we are now called on to review.

"The first of these instruments is dated July 10th 1860. It assigns to Frederick Fairthorne all the claims, debts, demands, book accounts, assets and effects of Lawson & Yerkes, the defendants in the attachment (except their real estate and stock of liquors on hand), to be held by him as security for such advances as he may make to pay the debts of the said firm. The amount to be advanced by said Fairthorne is to be sufficient to pay $18,962.37, borrowed money, and not to exceed $4000 bills payable in July 1860. There are some other provisions, which are not material to the question. It cannot be contended, and indeed it has not been seriously pressed, that this instrument, standing alone, is an assignment for the benefit of creditors. It is a mere mortgage to secure future advances, and it is entirely immaterial for what purpose the advances were to be made. That they were expressed to be for the payment of debts, gave the creditors no interest in them. Such mortgages have been distinctly held not to be within the Act of 24th of March 1818: Ridgway v. Stewart, 4 W. & S. 383; Manufacturers' and Mechanics' Bank v. Bank of Pennsylvania, 7 Id. 343; Griffin v. Rogers, 2 Wright 382. By repaying to Mr. Fairthorne his advances, charges and commissions, according to the terms of the paper, the grantors could at any time have demanded and enforced, in equity, a reassignment to them of the securities. This mortgage was a lien on the assets transferred, not from its date, but from the date of his advances on the principle settled in Terhoven v. Kerns, 2 Barr 96; The Bank of Montgomery County's Appeal, 12 Casey 170; so that an attachment by any creditor would have had a claim upon the fund which might come to be in his hands before any advances subsequently made by him.

7 P. F. Smith—15

[Beans *v.* Bullitt.]

"It is the second instrument upon which the difficulty is supposed to arise. It is dated July 25th 1860. It provides for the dissolution of the firm of Lawson & Yerkes. The stock is to be appraised, and then equally to be divided. Each partner is to give his note to Fairthorne for the amount received, payable in certain instalments. All the other estate of the firm is placed in the hands of Fairthorne, as attorney in fact of Lawson & Yerkes, who receives it for the purpose of collecting, selling and converting the same into money, and then to apply the proceeds to the payment of all the debts of the firm when and as the same shall become due and payable—first paying the said Fairthorne his advances, charges and expenses. Fairthorne is authorized to use the name of the firm, and other provisions are made in regard to the manner in which the business is to be done, which need not be here referred to. Under this instrument money was collected by Fairthorne, but not enough to repay the advances made by him.

"It is supposed that the case of Watson *v.* Bagaley, 2 Jones 164, decides that such power of attorney is an assignment for the benefit of creditors. In that case the power authorized the collection of the debts of the grantor, and directed the attorney, from the proceeds, to pay certain creditors named, and to apply the residue *pro ratâ* among all the creditors. It was held, and properly held, that it was a binding appropriation, good against an attachment within the cases of The United States *v.* Vaughan, 3 Binn. 400, and Sharpless *v.* Welsh, 4 Dall. 280; and that, therefore, it was a virtual assignment. But there is nothing like that in the case before us—no appropriation to any particular creditors. Whatever Fairthorne received beyond his advances secured by the previous mortgage, would have been subject to the attachment of any creditor, and it is plain that for all assets not included in the mortgage, the debtors themselves could have been garnished or the property levied on by execution, for the title was still in Lawson & Yerkes. It is nothing more than a party constituting an attorney to wind up his business, pay his debts, and return the residue, if any, to him. It is a part of the case that such was the object of this paper—Lawson & Yerkes supposing themselves to be perfectly solvent. The troubles of the country, however, interfered with the collection of the assets, and, finding themselves unable to pay their debts in full, as they had anticipated, they executed the last paper in the series, which is dated September 25th 1861. It is a transfer to their creditors, directly and by name, of all the assets in the hands of Fairthorne (under and subject to the terms of the previous papers, and to the lien of the said Fairthorne for advances then amounting to $12,546.78, and also to such sums of money as he may hereafter advance under the said agreements),

[Beans v. Bullitt.]

to secure to them their respective debts, specifying the amount in each case, with full power to collect and convert them into money, and apply the same, when and as collected and converted, to the payment, satisfaction and discharge of the said debts *pro ratâ*—the same being thereby transferred as collateral security for said debts. After the transfer, Mr. Fairthorne received notice thereof, signed by all the creditors named in the instrument, except the plaintiff, and one other creditor whose claim is of small amount. It has not been pretended that this transfer is an assignment for the benefit of creditors, as it stands by itself. The decisions of the Supreme Court have expressly settled the contrary: Chaffees *v.* Risk, 12 Harris 432; Henderson's Appeal, 7 Casey 502. Now, if the transfer of July 10th 1860, was a mortgage, and therefore valid without recording, and the paper of July 25th 1860, a mere power to wind up as agent or attorney, and after these instruments the assets remained liable to execution and attachment, though subject to the mortgage, and if the transfer of September 25th 1865, is confessedly not an assignment requiring to be recorded, it is difficult to see how the three together can be so. The plaintiff's attachment was not laid until after the last transfer had been made and accepted, and the funds in the hands of the garnishee at that time undoubtedly belonged, both at law and in equity, not to Lawson & Yerkes the defendants, but to the creditors to whom they had been assigned. We think, then, upon the whole, that the direction of the judge to the jury was correct.

"Rule discharged."

Beans took a writ of error and assigned the charge of the court for error.

*T. E. McElroy*, for plaintiff in error.—Exhibits A. and B. are assignments for the benefit of creditors within the Act of March 24th 1818, 7 Sm. 132, Purd. 61, pl. 6, *et seq.*; Watson *v.* Bagaley, 2 Jones 164; Sharpless *v.* Welsh, 4 Dall. 280; United States *v.* Vaughan, 3 Binn. 400; Corser *v.* Craig, 1 W. C. C. R. 424; Clemson *v.* Davidson, 5 Binn. 392; Linton *v.* Butz, 7 Barr 89; Clemens *v.* Davis, Id. 263; Flanagin *v.* Wetherill, 5 Whart. 280; Thomas *v.* Lowber, 2 Harris 438; Lucas *v.* Sunb. and Erie Railroad, 8 Casey 458; Bittenbender *v.* Same, 4 Wright 269; Driesbach *v.* Becker, 10 Casey 152; Reigart's Appeal, 4 Barr 477; Vallance *v.* Miner's Life Ins. Co., 6 Wright 444; Guy *v.* McIlree, 2 Casey 92; Englebert *v.* Blanjot, 2 Whart. 240; Fallon's Appeal, 6 Wright 235; McBroom and Wood's Appeal, 8 Id. 92; Dubois' Appeal, 2 Id. 231; York Co. Bank *v.* Carter, Id. 446; Ridgway *v.* Stewart, 4 W. & S. 383; Manuf. and Mech. Bank *v.* Bank of Penna., 7 Id. 335; Griffin *v.* Rogers, 2 Wright 382; Chaffees

[Beans *v.* Bullitt.]

*v.* Risk, 12 Harris 432; Henderson's Appeal, 7 Casey 502; Mellon's Appeal, 1 Grant 212.   There is no such thing in Pennsylvania as an assignment of property to third persons to sell and pay the proceeds to creditors other than those third persons, which is considered not to be a trust, and therefore revocable by the assignor, when the assignees have once accepted the assignment, and entered upon the duties thereof, and equity will decree all such assignments to be trusts for such creditors, and will enforce them at their suit, no matter in what form the assignment may be made, and whether such assignment be legal or equitable: Walwyn *v.* Coutts, 2 Meriv. 707; s. c. 3 Sim. 14; Garrard *v.* Lauderdale, 3 Sim. 1; s. c. 2 Russ. & Myl. 451; Bill *v.* Cureton, 2 Myl. & K. 511; Burd *v.* Smith, 4 Dall. 85; Levine *v.* Will, 1 Id. 430; Peirce *v.* McKeehan, 3 W. & S. 280; Wilt *v.* Franklin, 1 Binn. 502; McKinney *v.* Rhoads, 5 Watts 343; Seal *v.* Duffy, 4 Barr 274; Read *v.* Robinson, 6 W. & S. 332; Jefferis's Appeal, 9 Casey 39; Klapp *v.* Shirk, 1 Harris 589; McClellan's Appeal, 2 Casey 463; Miller's Appeal, 11 Id. 481; Moses *v.* Murgatroyd, 1 Johns. Cas. in Eq. 119; Shepherd *v.* McEvers, 4 Id. 136; Nicoll *v.* Mumford, Id. 522; Brooks *v.* Marbury, 11 Wheat. 78; Pingree *v.* Comstock, 18 Id.; N. E. Bank *v.* Lewis, 8 Id. 113, 188; Ingram *v.* Kirkpatrick, 6 Ired. Eq. Rep. 462; Stimpson *v.* Fries, 2 Jones (N. C.) Eq. Rep. 156; Okie *v.* Kelly, 2 Jones 326; Smith *v.* Bank, 5 S. & R. 318; Gray *v.* Bell, 4 Watts 410; Wilhelm *v.* Miley, 5 S. & R. 137; Vanarsdale *v.* Richards, 1 Whart. 408; Rush *v.* Good, 14 S. & R. 226; Aycinena *v.* Peries, 6 W. & S. 243; Act of June 14th 1836, § 1, Pamph. L. 630, Purd. 61, pl. 8; Fulton's Estate, 1 P. F. Smith 204; Robb's Appeal, 5 Wright 45; McCurdy's Appeal, 5 W. & S. 397; Greiner's Estate, 2 Watts 414; Wallace's Appeal, 5 Barr 103; Dana *v.* U. S. Bank, 5 W. & S. 223.

Nothing passed by Exhibit C. to the creditors named in it: Stewart *v.* McMinn, 5 W. & S. 100; McAllister *v.* Marshall, 6 Binn. 338; Sheerer's Assignees *v.* Lautzerheizer, 6 Watts 543; McClurg *v.* Lecky, 3 P. R. 83; Weber *v.* Samuel, 7 Barr 521; In re Wilson, 4 Barr 430; Moss *v.* Hanson, 5 Harris 379; Thomas *v.* Phillips, 9 Barr 355; Shaffer *v.* Watkins, 7 W. & S. 219.

*S. Dickson* (with whom were *G. Sergeant* and *A. Briggs*) for defendant in error.—Exhibit A. was a mere pledge: Ridgway *v.* Stewart, 4 W. & S. 383; Griffin *v.* Rodgers, 2 Wright 382; York County Bank *v.* Carter, Id. 446.

Exhibit B. was nothing but a letter of attorney: Watson *v.* Bagaley, 2 Jones 167; Smart *v.* Sandars, 57 E. C. L. 895–917; Fuller *v.* Emerson, 7 Cush. 203; Garrard *v.* Lord Lauderdale, 3 Sim. 1; Walwyn *v.* Couts, Id. 7; Brind *v.* Hampshire, 1 M &

1868.]     OF PENNSYLVANIA.     229

W. 365; Scott v.. Porcher, 3 Merivale 652; Finney v. Finney, 4 Harris 380.

It was not made in contemplation of insolvency: Gratz v. Railroad, 5 Wright 447.

It did not transfer the title to Fairthorne: Lucas v. Railroad, 8 Casey 461; and was revoked by Exhibit C.: Chaffees v. Risk, 12 Harris 432; Henderson's Appeal, 7 Casey 502; Bank v. Carter, 2 Wright 446; Conthwaite v. Frith, 4 De G. & Sm. 582.

The opinion of the court was delivered, February 20th 1868, by

STRONG, J.—This case has been very ably and elaborately argued on behalf of the plaintiffs in error, but we are not convinced that there was any mistake in the instruction given to the jury by the District Court. The charge is well vindicated by the opinion of the president of that court on the motion for a new trial.

To constitute an assignment in trust for the benefit of creditors, within the meaning of the Act of March 24th 1818, there must be a transfer of the property assigned to another;—more than a mere transmission of its custody or management. The form is not material, but there must be the substance. There must be a trust also created for the creditors of the assignor, and a trust which is enforceable in equity. Tried by these principles, in regard to which there is no controversy, it cannot be held that either of the three instruments executed by Lawson & Yerkes, or that all of them, constituted such an assignment. The first was made on the 10th of July 1860. It was simply a pledge or a mortgage to Fairthorne to secure subsequent advances he might make, to pay the debts of Lawson & Yerkes, not exceeding $22,962.37, coupled with a power given him to pledge or to mortgage the property to others to secure any money he might borrow to make the advances. This surely did not constitute him a trustee for creditors. It transferred no ownership to him except so far as was needed to secure him for advances he might make. It left the remainder of the ownership in Lawson & Yerkes as much exposed as ever to seizures by their creditors, and it left the entire ownership subject to seizure until the contemplated advances were actually made: Terhoven v. Kerns, 2 Barr 96; Bank of Montgomery County's Appeal, 12 Casey 170. Or, if it be considered to have been obligatory upon Fairthorne to make advances, it was a mortgage to the extent of his agreement to make them. The purpose for which the advances were to be made is immaterial. It may have been a motive for Fairthorne's entering into the arrangement, but it cannot change the character of the instrument. It certainly does not amount to an appropriation of the money to be advanced to the creditors. An avowed purpose of a borrower of a sum of money to apply it or to have it applied in a declared

way, has never yet been held to be an application of it. The creditors of the assignors then acquired no rights against Fairthorne under the instrument of July 10th 1860.

It is argued, however, that a trust was created in their favor by the second instrument, dated July 25th 1860. The provisions of that were in substance as follows. It recognised that the dissolution of the partnership of Lawson & Yerkes was to take place on the 31st day of that month. It provided that the stock of goods on hand should be equally divided between the partners, and that each should give his note to Fairthorne for the appraised value of the half of the stock taken by him, the notes to be held by Fairthorne as attorney in fact of Lawson & Yerkes. The notes, bills, book accounts, claims and effects of the firm were by the said instrument also placed in the hands of the said Fairthorne as attorney in fact of the firm, they agreeing to do all acts necessary to enable him to vest a complete title to the property in any purchaser or purchasers, and to collect, and sell and convert the property and assets into money. The instrument further stipulated that Fairthorne took the said assets for the purpose of converting them into money; with power to make settlements, and compromises and exchanges; with power to sell, restricted only by a requirement to consult Lawson & Yerkes, giving to either of them who might object to his proposed sale the option to take the claim or property within forty-eight hours after notice. Fairthorne was required to apply the proceeds of all the assets to the payment of the debts of Lawson & Yerkes, after deducting his advances and expenses, having the right in certain contingencies to call for the payment of the notes first above mentioned, given for the appraised value of the stock on hand, and having a right to call for other notes, to be renewed from time to time. It was finally stipulated that the power of attorney was given to enable Fairthorne to wind up the business of the firm, and was only intended to constitute him attorney in fact of the firm. There are other provisions, but none bearing upon the present case. Under this power money was realized, but not enough to reimburse to Fairthorne his advances, before the attachment was laid, or before all the interest of Lawson & Yerkes was assigned by the third instrument hereafter to be referred to.

Now, of this instrument of July 25th 1860, it may be said that it is a simple power of attorney, coupled with no interest in the property placed in the custody of Fairthorne. He had an interest in the execution of the power, but none in the property itself. The legal title remained in Lawson & Yerkes, except so far as it had been pledged by the instrument of July 10th 1860. Had it been pledged by the first instrument to some other person than Fairthorne, the operation of the second instrument clearly would have been only to create Fairthorne a mere agent. But what dif-

ference can it make that it was pledged to the same person ? In either case it could confer power only over the rights that the principals had, and it carefully avoids a transmission of those rights. It reserves a voice in all sales.

But it is argued that because the attorney was directed to apply the proceeds of the assets to the payment of all the debts of the firm of Lawson & Yerkes, the creditors acquired an interest under the power, and that it must be regarded as an assignment in trust for creditors, notwithstanding it passed no title to the attorney, under the doctrine enunciated in Watson v. Bagaley, 2 Jones 164. That case certainly went very far. Speaking for myself, I may say I have always thought the Act of 1818 had only in view those peculiar instruments that were commonly understood to be assignments in trust for creditors. They were very common and well known. I do not believe the legislature contemplated any such writings as were held in Lucas v. The Sunbury and Erie Railroad Company, 8 Casey 458, and in Bittenbinder against the Same, 4 Wright 269, to be such assignments in trust. I bow, however, to the decisions. But Watson v. Bagaley went upon the ground that the power of attorney was not revocable after it had been executed, and after the attachment had been laid. The money had been collected under the power, and there was a devotion of it to certain specified creditors. It might, therefore, have been held an appropriation to those creditors under Sharpless v. Welsh, 4 Dall. 280, and United States v. Vaughan, 3 Binn. 400. But in the present case the power of attorney had not been executed when Lawson & Yerkes assigned all the property placed in the hands of Fairthorne directly to certain creditors, without the intervention of any trust, subject, it is true, to the terms of the preceding agreement, and subject to Fairthorne's claim for advances. This third instrument was made on the 25th of September, 1861, before the plaintiff's attachment was laid. Fairthorne had not then realized under the first instrument, or under the power of attorney, enough to repay his advances. Of course he had nothing in hand for the creditors, and having nothing the power was revocable, subject only to his rights. No creditor could resist a revocation, or any appropriation Lawson & Yerkes might determine to make. We have gone very far in favoring what are called equitable assignments or appropriations, but never so far as to hold that an agent directed to pay money generally without specification of amount or of the person of the payee, as distinguished from others, is a trustee for any other than the principal.

We hold, then, that neither by the instrument of July 10th 1860, nor that of July 25th 1860, nor by both, was any assignment in trust for the benefit of creditors created. There was no transmission of property for such a purpose to an assignee, nor

[Beans *v.* Bullitt.]

was there any legal or equitable interest vested in creditors. The first was but a pledge or mortgage. The second was a mere power of attorney, without any trust for creditors, and the paper of September 25th 1865 was an absolute transfer, without a trust; not an assignment for the benefit of creditors, as ruled in Chaffees *v.* Risk, 12 Harris 432, Henderson's Appeal, 7 Casey 502, and York County Bank *v.* Carter, 2 Wright 446. There was, therefore, nothing in the hands of the garnishees subject to the plaintiff's attachment when it was laid, and hence the jury were properly instructed to return a verdict in their favor.

Judgment affirmed.